IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BOREHOLE SEISMIC, LLC,                      §
                                            §
            Plaintiff,                      §
                                            §
v.                                          §        CIVIL ACTION NO. H-15-0613
                                            §
INTERNATIONAL OIL AND GAS                   §
TECHNOLOGY LIMITED,                         §
                                            §
            Defendant.                      §

## MEMORANDUM OPINION AND ORDER

Plaintiff, Borehole Seismic, LLC, brings this action against defendant, International Oil and Gas Technology Limited ("IOGT"), asserting claims for intentional and constructive fraudulent transfer in violation of the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Texas Business and Commerce Code §§ 24.005(a)(1), 24.005(a)(2), and 24.006, and unjust enrichment arising from an allegedly fraudulent transfer of intellectual property. Pending before the court is International Oil and Gas Technology Limited's Motion to Dismiss (Docket Entry No. 29) in which IOGT asks the court to dismiss plaintiff's complaint in its entirety for lack of personal and/or subject matter jurisdiction, improper venue, failure to state a claim for which relief may be granted, and failure to plead fraud with particularity. For the reasons stated below, the pending motion to dismiss will be granted for lack of personal jurisdiction and failure to establish <u>in rem</u> subject

matter jurisdiction, and this action will be dismissed without prejudice.

## I. Factual Allegations and Undisputed Facts

Plaintiff alleges that it is a Texas Limited Liability Company with its principal place of business is Houston, Texas, and with two members, Robinson Howell and Ramsey Miller, who are both Texas citizens.[1] This action arises from plaintiff's efforts to collect on an account receivable acquired from PanAmerican Seismic, Inc. ("PanAmerican"), a Colorado corporation, for services that PanAmerican provided to SR2020, Inc. ("SR2020"), a Delaware corporation with its principal place of business in California.[2] Plaintiff alleges that in April, May, and June of 2014, PanAmerican performed services for SR2020 on the Cimarex Cleveland pad in Reeves County, Texas; that in June, July, and August of 2014, PanAmerican invoiced SR2020 a total of $787,000.00 for those services; but that SR2020 paid PanAmerican only $373,500.00, leaving an outstanding debt of $413,500.00 plus late payment interest accruing at the rate of 1.5% per month.[3] Plaintiff alleges that it purchased PanAmerican's SR2020 account receivable on February 10, 2015, that at the time of purchase SR2020 owed $463,396.11 on the account, and that due to the accrual of late

---

[1]Complaint, Docket Entry No. 1, p. 1 ¶ 1.

[2]Id. at 2 ¶ 5.

[3]Id. at 2-4 ¶¶ 6-10.

payment interest, SR2020 owed $469,566.26 on the account the day
this action was filed on March 9, 2015.[4]

Plaintiff alleges that on October 30, 2014, SR2020's CFO
Deanna Monzon stated that SR2020 was insolvent, that on October 31,
2014, SR2020 was sued in Harris County Civil Court at Law No. 3
(Case No. 1054789) on an account receivable not the subject of this
action, and that default judgment was entered against SR2020 in
that action on January 8, 2015.[5]  Plaintiff alleges that

> [d]uring the pendency of that case, SR2020, Inc.
> transferred intellectual property to Houston company,
> OptaSense, Inc. in exchange for:
>
> > (1) an up-front payment of $1.7 million to SR2020,
> > Inc.; and
> >
> > (2) a deferred payment of up to $1.0 million
> > payable to International Oil and Gas Technology
> > Limited (LSE:OGT), the Defendant in this action.[6]

Plaintiff alleges that

> exercised control over SR2020 at the time of the
> November 20, 2014 transfer, and sought to hide the
> transfer from SR2020's U.S. creditors by prohibiting
> dissemination of information regarding its occurrence
> . . . SR2020 then ignored the litigation in Harris County
> Civil Court at Law No. 3 and permitted a default judgment
> to be rendered against it in the amount of $74,897.20.
> This timing matters because:
>
> > A transfer made or obligation incurred by a
> > debtor is fraudulent as to a creditor, whether
> > the creditor's claim arose before or within a
> > reasonable time after the transfer was made or
> > the obligation was incurred, if the debtor

---

[4] *Id.* at 4 ¶¶ 11-12.

[5] *Id.* ¶ 14.

[6] *Id.* at 5 ¶ 15.

> made the transfer or incurred the obligation
> with an actual intent to hinder, delay, or
> defraud any creditor of the debtor.    In
> determining actual intent, consideration may
> be given, among other factors, to whether
> before the transfer was made, the debtor had
> been sued or threatened with suit.

> *Redmon v. Giffith*, 202 S.W.3d 225 (Tex. App.—Tyler 2006)
> (citing Tex. Bus. & Comm. Code Ann. § 24.005(a)(1),
> (b)(4) (Vernon 2002)).    SR2020 was controlled by [IOGT],
> was sued on October 31, 2014, transferred intellectual
> property on or about November 20, 2014, the transfer
> constituted substantially all of SR2020's assets, and
> [IOGT] gave explicit instructions to not disseminate the
> fact of the transfer into the United States or to U.S.
> persons, hiding the transfer from U.S. creditors.[7]

Alleging that it stands in the shoes of PanAmerican as the purchaser of its SR2020 account receivable, plaintiff asserts claims against IOGT for intentional and constructive fraudulent transfer in violation of Texas Business and Commerce Code §§ 24.005(a)(1)-(2) and 24.006, and for unjust enrichment.[8] Plaintiff alleges that

> [t]his Court has jurisdiction over this matter under 28
> U.S.C. § 1332 because: (i) the Plaintiff is a citizen of
> Texas; (ii) the Defendant is a foreign entity located in
> Guernsey, Channel Islands, a British Crown dependency;
> and (iii) the amount in controversy exceeds $75,000,
> exclusive of interest and costs.[9]

Plaintiff seeks

> *in personam* remedies against [IOGT] . . . [and] *in rem*
> remedies against the fraudulently transferred assets and
> proceeds therefrom, until the outstanding amount of the
> PanAmerican-SR2020 receivable (presently $469,566.26) is

---

[7] Id. at 5-6 ¶ 16.

[8] Id. at 6-10 ¶¶ 17-23.

[9] Id. at 2 ¶ 3.

satisfied, plus interest, court costs, and/or any other relief to which the Plaintiff may be justly entitled.[10]

On February 10, 2015, plaintiff filed suit against SR2020 in the United States District Court for the Western District of Texas, Austin Division, <u>Borehole Seismic, LLC v. SR2020, Inc.</u>, Civil Action No. 1:15-0124-SS.  On March 23, 2015, the court entered a Default Final Judgment stating in pertinent part:

> It is accordingly ORDERED that default final judgment is hereby entered in favor of Plaintiff Borehole Seismic, LLC and against Defendant SR2020, Inc. in the amount of $470,023.31 as of March 11, 2015, plus interest of $463.58 per day pursuant to Texas Finance Code § 304.002, plus court costs . . .[11]

## II.  <u>Analysis</u>

Citing Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(1)-(3) and (6), and 12(d), IOGT moves to dismiss plaintiff's Complaint in its entirety for lack of personal and/or subject matter jurisdiction, improper venue, failure to state a claim for which relief may be granted, and failure to plead fraud with particularity.

**A.   Plaintiff Has Not Made a Prima Facie Showing of Personal Jurisdiction Over IOGT**

IOGT argues that all of plaintiff's claims should be dismissed for lack of personal jurisdiction because IOGT has no contacts with Texas sufficient to establish general jurisdiction, because

---

[10]<u>Id.</u> at 11 ¶ 24.

[11]Exhibit 8 to Plaintiff's Response to Defendant's Motion to Dismiss, Docket Entry No. 31.

plaintiff alleges no actions taken by IOGT in Texas to establish specific jurisdiction, and because the court's exercise of personal jurisdiction over IOGT would offend traditional notions of fair play and substantial justice.[12]

### 1.   Standard of Review

Dismissal for lack of personal jurisdiction is governed by Federal Rule of Civil Procedure 12(b)(2).  When a foreign defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff 'bears the burden of establishing the district court's jurisdiction over the defendant.'"   Quick Technologies, Inc. v. Sage Group PLC, 313 F.3d 338, 343 (5th Cir. 2002), cert. denied, 124 S. Ct. 66 (2003) (quoting Mink v. AAAA Development LLC, 190 F.3d 333, 335 (5th Cir. 1999)).  "When the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a *prima facie* case that personal jurisdiction is proper.'"   Id. (quoting Wilson v. Belin, 20 F.3d 644, 648 (5th Cir.), cert. denied, 115 S. Ct. 322 (1994)).  "In making its determination, the district court may consider the contents of the record before the court at the time of the motion, including 'affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of

---

[12]International Oil and Gas Technology Limited's Motion to Dismiss ("IOGT's Motion to Dismiss"), Docket Entry No. 29, pp. 9-15 ¶¶ 11-30.

discovery.'"   Id. at 344 (quoting Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165 (5th Cir. 1985)).  The court must accept as true the uncontroverted allegations in the plaintiff's complaint and must resolve in favor of the plaintiff any factual conflicts. Guidry v. United States Tobacco Co., 188 F.3d 619, 625 (5th Cir. 1999).  However, the court is not obligated to credit conclusory allegations, even if uncontroverted.   Panda Brandywine Corp. v. Potomac Electric Power Co., 253 F.3d 865, 869 (5th Cir. 2001). "Absent any dispute as to the relevant facts, the issue of whether personal jurisdiction may be exercised over a nonresident defendant is a question of law to be determined . . . by th[e C]ourt." Ruston Gas Turbines, Inc. v. Donaldson Co., Inc., 9 F.3d 415, 418 (5th Cir. 1993).

    2.   Applicable Law

"A federal district court sitting in diversity may exercise personal jurisdiction only to the extent permitted a state court under applicable state law." Allred v. Moore & Peterson, 117 F.3d 278, 281 (5th Cir. 1997), cert. denied, 118 S. Ct. 691 (1998). Moreover, a federal court may only exercise personal jurisdiction over a nonresident defendant if the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.  Id.  Thus, the court may exercise personal jurisdiction over a nonresident defendant like IOGT if "(1) the forum state's long-arm statute confers personal jurisdiction over that defendant;

-7-

and (2) the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." <u>McFadin v. Gerber</u>, 587 F.3d 753, 759 (5th Cir. 2009), <u>cert. denied</u>, 131 S. Ct. 68 (2010).  Since the Texas long-arm statute extends as far as constitutional due process allows, the court considers only the second step of the inquiry.  <u>Id.</u>

Due process is satisfied if the "nonresident defendant has certain minimum contacts with [the forum] such that the maintenance of suit does not offend 'traditional notions of fair play and substantial justice.'" <u>Gardemal v. Westin Hotel Co.</u>, 186 F.3d 588, 595 (5th Cir. 1999) (quoting <u>International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement</u>, 66 S. Ct. 154, 158 (1945)) (quoting <u>Milliken v. Meyer</u>, 61 S. Ct. 339, 343 (1940)).  "The 'minimum contacts' inquiry is fact intensive and no one element is decisive; rather the touchstone is whether the defendant's conduct shows that it 'reasonably anticipates being haled into court.'" <u>McFadin</u>, 587 F.3d at 759.  Once a plaintiff satisfies these two requirements, a presumption arises that jurisdiction is reasonable, and the burden of proof and persuasion shifts to the defendant opposing jurisdiction to present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." <u>Burger King Corp. v. Rudzewicz</u>, 105 S. Ct. 2174, 2185 (1985).

3.   <u>Minimum Contacts</u>

"There are two types of 'minimum contacts': those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction." <u>Lewis v. Fresne</u>, 252 F.3d 352, 358 (5th Cir. 2001). <u>See also</u> <u>Panda Brandywine</u>, 253 F.3d at 867-68 (recognizing that a district court may assert either general or specific personal jurisdiction over a party). IOGT argues that plaintiff is not able to carry its burden of making a <u>prima facie</u> showing that IOGT purposefully established "minimum contacts" with Texas that are sufficient to give rise to either "specific" or "general" personal jurisdiction.[13] Plaintiff responds that the court may exercise both specific and general personal jurisdiction over IOGT.[14]

(a)   General Jurisdiction

General jurisdiction requires that a defendant's contacts with the forum state be "substantial and 'continuous and systematic' but unrelated to the instant cause of action." <u>Central Freight Lines Inc. v. APA Transport Corp.</u>, 322 F.3d 376, 381 (5th Cir. 2003) (quoting <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 104 S. Ct. 1868, 1872-74 (1984)). "The 'continuous and systematic contacts test is a difficult one to meet, requiring extensive

─────────────────

[13]IOGT's Motion to Dismiss, Docket Entry No. 29, pp. 9-11.

[14]Plaintiff's Response to Defendant's Motion to Dismiss ("Plaintiff's Response"), Docket Entry No. 31, pp. 1-7.

contacts between a defendant and a forum.'" <u>Jackson v. Tanfoglio Giuseppe, S.R.L.</u>, 615 F.3d 579, 584 (5th Cir. 2010) (quoting <u>Johnston v. Multidata Systems International Corp.</u>, 523 F.3d 602, 609 (5th Cir. 2008)). "To confer general jurisdiction, a defendant must have a business presence in the forum state." <u>Id.</u> (citing <u>Access Telecom, Inc. v. MCI Telecommunications Corp.</u>, 197 F.3d 694, 717 (5th Cir. 1999), <u>cert. denied</u>, 121 S. Ct. 275 and 292 (2000)). "General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed." <u>Johnston</u>, 523 F.3d at 610 (quoting <u>Access Telecom</u>, 197 F.3d at 717). "[V[ague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." <u>Id.</u> Moreover, "[t]he contacts must be reviewed in toto, and not in isolation from one another." <u>Id.</u>

The seminal general jurisdiction case is <u>Perkins v. Benguet Consolidated Mining Co.</u>, 72 S. Ct. 413 (1952), in which the Supreme Court first articulated the idea that a court may exercise personal jurisdiction over a foreign corporation based on general business operations within the forum state. The Supreme Court upheld the district court's exercise of general personal jurisdiction in Ohio over a Philippine corporation whose president and general manager relocated to Ohio during the Japanese occupation of the Philippine Islands. While in Ohio the president maintained a corporate office where he kept the corporation's records, conducted director's

meetings, and made all key business decisions. The corporation also distributed salary checks drawn on two Ohio bank accounts and engaged an Ohio bank to act as a transfer agent. The Court held that Ohio could exercise jurisdiction over the corporation because the president had "carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." Id. at 419.

By contrast, in Helicopteros the Supreme Court held that the defendant's general business contacts with Texas were insufficient to support an exercise of general jurisdiction despite the fact that the defendant had purchased equipment from a company in the forum state. 104 S. Ct. at 1873-74. Over a six-year period the defendant purchased helicopters (approximately 80% of its fleet), spare parts, and accessories for more than $4 million from a Texas company; sent its prospective pilots to Texas for training; sent management and maintenance personnel to Texas for technical consultations; and received a check for over $5 million that was drawn upon a Texas bank. Nevertheless, the Court held that none of the contacts were substantial enough standing alone or taken together to support the assertion of general jurisdiction. The Court explained that the mere purchase of goods from a state, even at regular intervals and in substantial amounts, was not enough to warrant the assertion of general jurisdiction over a non-resident on a cause of action unrelated to those purchases. Nor was the Court persuaded that the nature of the contacts was enhanced

because the defendant sent personnel to Texas for training in connection with the purchases. Instead, the Court concluded that this was merely one aspect of the package of goods and services that the defendant had purchased. Finally, the Court concluded that the receipt of a check drawn from a Texas bank was of no consequence because the choice of bank from which payment was made resulted from the fortuitous "unilateral activity" of a third party. Id. at 1873.

Citing Helicopteros, 104 S. Ct. at 1868, IOGT argues that it is not subject to the court's general jurisdiction because "IOGT has not engaged in substantial business activities in Texas, and while OptaSense, the purchaser of SR2020's assets, is located in Houston, Texas, IOGT's tangential involvement occurred outside the United States."[15] In support of this argument, IOGT submits the declaration of Christopher Hill, the non-executive chairman of IOGT's board of directors who states:

3. IOGT is a company incorporated in and based in Bailiwick of Guernsey, a dependency of the British Crown, and its sole office and principal place of business is located in Guernsey.

4. IOGT does not have a certificate of authority to conduct business in Texas or in any other state in the United States of America. IOGT does not maintain an office in Texas or in any other state in the United States of America and does not maintain a registered agent on who[m] service of process can be made in Texas or anywhere in the United States of America.

---

[15] IOGT's Motion to Dismiss, Docket Entry No. 29, p. 10 ¶ 12.

5. IOGT does not and has never:

   a. Owned or leased any real or personal property in Texas or in the United States of America;

   b. Borrowed any money in Texas or in the United States of America;

   c. Had any employees who reside or are domiciled in Texas or who regularly travel to Texas;

   d. Directed any advertising, specifically towards residents in Texas, nor advertised in any publications that are directed primarily toward residents in Texas or in the United States of America;

   e. Had any personal telephone listings or mailing addresses in Texas or in the United States of America;

   f. Entered into any contracts with a Texas choice or forum selection clause;

   g. Entered into a contract that requires performance of that contract, in whole or in part, in Texas;

   h. Incurred or paid any property taxes in Texas or in the United States of America;

   i. Filed any tax return in Texas or in the United States of America;

   j. Maintained or designated a registered agent for service of process in Texas or in the United States of America;

   k. Committed any torts, in whole or in part, in Texas or in the United States of America; and

   l. Recruited Texas residents, directly or through an intermediary located in Texas, for employment inside or outside of Texas.

6. IOGT has no continuing and systematic activities in any state in the United States of America, including Texas.

-13-

7.     IOGT is a secured creditor of SR2020, Inc.
("SR2020"), a company incorporated in the State of
Delaware.   IOGT's liens on SR2020's property are
reflected by the filing of multiple UCC financing
statements on file with Delaware's Secretary of
State.   True and correct copies of those financing
statements are attached as exhibits to IOGT's
Motion to Dismiss.   In connection with the sale of
SR2020's property to OptaSense, Inc. ("OptaSense"),
which is also a company incorporated in the State
of Delaware, IOGT released its lien on certain of
SR2020's [] property and, in return, received a
promissory note from OptaSense payable only if
certain financial milestones and thresholds are
surpassed by OptaSense.   The earliest date by which
the promissory note would be paid by OptaSense is
on or after November 20, 2015.   It is uncertain and
unknown whether OptaSense will earn sufficient
revenue in order to trigger the payment upon the
promissory note to IOGT.   The promissory note
contains a choice of law provision selecting
Delaware as the law governing matters arising out
of the performance of the promissory note.[16]

Plaintiff responds:

That the Defendant calls itself "a foreign company with
no ties to the United States" is belied by its own annual
reports.   The Defendant purposefully availed itself of
this forum and should have expected suit here.   Rather
than merely sitting across the Atlantic as a secured
creditor of SR2020, the Defendant was a 100% owner
exercising meticulous control over American operations —
which included a facility in Houston.[17]

In support of this argument, plaintiff cites an excerpt from IOGT's

annual report for the year ending December 31, 2013, stating that

---

[16]Declaration of Christopher Hill in Support of International
Oil and Gas Technology Limited's Motion to Dismiss ("Hill
Declaration"), Exhibit 3 to IOGT's Motion to Dismiss, Docket Entry
No. 29-2, pp. 2-3 ¶¶ 3-7.   See also IOGT's Motion to Dismiss,
Docket Entry No. 29, p. 10 ¶¶ 13-14.

[17]Plaintiff's Response, Docket Entry No. 31, p. 1.

-14-

IOGT "directly owns 100 per cent of the common shares of SR2020."[18]
Plaintiff also argues that IOGT "was not a distant secured creditor
of SR2020, but a 100% owner with unhindered authority to manage
SR2020's Houston operations,"[19] and that IOGT "exercised its
authority and was directly, actively involved in SR2020's American
operations, including those at its Houston facility."[20] As evidence
that IOGT was directly involved in SR2020's American operations,
including those at its Houston facility, plaintiff cites an excerpt
from IOGT's 2012 annual report stating:

> During 2012, the Investment Manager worked with SR2020's
> management team to execute the new business plan, which
> included hiring new senior sales staff, adding new
> equipment for acquisition and data processing, and
> developing the next generation of acquisition system.
> This plan was backed by an injection of US$2.1 million of
> capital from the Company.  SR2020 focused on its
> acquisition equipment capabilities by adding additional
> analogue systems and, with a third party, began the
> development of a new fibre-optic system that should be
> ready for commercial use in mid-2013.  On the operations
> side, SR2020 continued to grow and opened a new Houston-
> based operations and sales facility.  The Investment
> Manager and the management team from SR2020 have put in
> place a business plan for 2013 that, if successfully
> executed, will see further growth in revenue.[21]

---

[18]Id. at 2 and 3 (citing IOGT Annual Report and Accounts for
the year ended 31 December 2013, Exhibit 6 thereto, p. 37 ("The
Company [i.e., IOGT] directly owns 100 percent of the common shares
of SR2020 subject to a possible allocation of up to 30 per cent for
an ESOP.")).

[19]Id. at 3.

[20]Id.

[21]Id. (quoting IOGT Annual Report and Accounts for the year
ended 31 December 2012, Exhibit 5, p. 15).

Plaintiff asserts that

> [t]he Defendant's "Investment Manager" . . . was
> controlled by the Defendant's board. . . The Investment
> Manager was "pro-active in managing" SR2020 and "in
> constant contact" to oversee "strategic planning and
> initiatives" as well as "in-depth monitoring of sales and
> budgets" while "finding sales leads" and "nurturing"
> cooperation with other branches of the Defendant's global
> enterprise.  Tellingly, the Defendant was so entwined
> with American operations that one of the Defendant's
> directors was sued in 2009 by a former SR2020 employee
> for wrongful dismissal.  The Defendant then provided the
> funds to settle that suit for $150,000.00.[22]

Plaintiff argues that IOGT is subject to the court's general

jurisdiction by virtue of the control that IOGT exerted over its

wholly-owned subsidiary, SR2020.

"Courts have long presumed the institutional independence of

related corporations, such as parent and subsidiary, when

determining if one corporation's contacts with a forum can be the

basis of a related corporation's contacts." Dickson Marine Inc. v.

Panalpina, Inc., 179 F.3d 331, 338 (5th Cir. 1999) (citing Cannon

Manufacturing Co. v. Cudahy Packing Co., 45 S. Ct. 250 (1925)).

"As a general rule . . . the proper exercise of personal

jurisdiction over a nonresident corporation may not be based solely

upon the contacts with the forum state of another corporate entity

with which the defendant may be affiliated." Freudensprung v.

Offshore Technical Services, Inc., 379 F.3d 327, 346 (5th Cir.

---

[22]Id. at 4 (citing Q-OGT 2008 Annual Report, Exhibit 1, p. 7;
Q-OGT 2009 Annual Report, Exhibit 2, p. 45; IOGT Annual Report
and Accounts for the year ended 31 December 2011, Exhibit 4, p. 44, and
IOGT Annual Report and Accounts for the year ended 31 December
2013, Exhibit 6, pp. 19 and 24).

2004) (citing <u>Cannon</u>, 45 S. Ct. at 250 (declining to attribute, for jurisdictional purposes, the presence of a subsidiary in the forum state to a nonresident parent corporation where the parent and subsidiary maintained distinct and separate corporate entities)).

Jurisdictional veil piercing is limited to situations where a parent corporation "exerts such domination and control over its subsidiary that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for the purposes of jurisdiction." <u>Hargrave v. Fibreboard Corp.</u>, 710 F.2d 1154, 1159 (5th Cir. 1983). <u>See also</u> <u>PHC-Minden, L.P. v. Kimberly-Clark Corp.</u>, 235 S.W.3d 163, 173 (Tex. 2007) (recognizing that jurisdictional veil piercing requires a plaintiff to show that the parent "exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction'"). The Texas Supreme Court has stated that

> [t]o "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. . . But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice.

<u>BMC Software Belgium, N.V. v. Marchand</u>, 83 S.W.3d 789, 799 (Tex. 2002) (citations omitted). The Texas Supreme Court has observed that the doctrine of jurisdictional veil piercing is similar to the

alter ego concept in substantive liability, but that "jurisdic-
tional veil piercing and substantive veil-piercing involve
different elements of proof." <u>PHC-Minden</u>, 235 S.W.3d at 174.  "[A]
subsidiary corporation will not be regarded as the alter ego of its
parent merely because of stock ownership, a duplication of some or
all of the directors or officers, or an exercise of the control
that stock ownership gives to stockholders." <u>Id.</u> at 175 (quoting
<u>Gentry v. Credit Plan Corp. of Houston</u>, 528 S.W.2d 571, 573 (Tex.
1975)).  Because under Texas law a corporation is presumed to be a
separate entity from its shareholders, the party seeking to ascribe
one corporation's actions to another by disregarding their distinct
corporate entities bears the burden of proof.  <u>BMC Software</u>, 83
S.W.3d at 798; <u>Dickson Marine</u>, 179 F.3d at 338.

Accepting as true the uncontested allegations in plaintiff's
complaint and the uncontested excerpts from IOGT's annual reports
that plaintiff cites in response to IOGT's motion to dismiss, the
court concludes that plaintiff has failed to make a prima facie
showing that IOGT is subject to the court's general jurisdiction.
Plaintiff has alleged and cited excerpts from IOGT's 2013 annual
report showing that IOGT owned all of SR2020's common stock.[23]  But
plaintiff has neither alleged nor made any showing that IOGT and

---

[23]<u>Id.</u> at 2 and 3 (citing IOGT Annual Report and Accounts for
the year ended 31 December 2013, Exhibit 6, Docket Entry No. 31-6,
p. 37 ("The Company [i.e., IOGT] directly owns 100 percent of the
common shares of SR2020 subject to a possible allocation of up to
30 per cent for an ESOP.")).

SR2020 disregarded corporate formalities or failed to maintain separate headquarters, that IOGT controlled SR2020's internal business operations and affairs, or that IOGT exercised an unusually high degree of control over SR2020, i.e., a degree of control greater than that normally associated with common ownership and not consistent with IOGT's investor status.

The closest plaintiff comes to making a prima facie showing that IOGT exerted an unusually high degree of control over SR2020's internal affairs is by alleging that IOGT's Investment Manager was proactive in managing SR2020, and that IOGT "was so entwined with American operations that one of [its] directors was sued in 2009 by a former SR2020 employee for wrongful dismissal."[24]  Examination of the cited references shows, however, that IOGT's Investment Manager was a separate entity, Linton Capital LLP, founded in 2005 as Quorum European Partners LLP and known in 2009 and 2010 as Sefton Partners LLP, and that the 2009 lawsuit not only predated by five years the events giving rise to this action, but also must have predated the time that IOGT owned all of SR2020's common stock because the plaintiff was not only a former SR2020 employee but also a shareholder of SR2020.  The cited reference also shows that the claims asserted in the 2009 lawsuit were not merely for wrongful dismissal but also for deprivation of shareholder's rights, and that IOGT's former director was not the only

---

[24]Id. at 4 (quoting 2009 Annual Report for Quorum Oil and Gas Technology Fund Limited (QOGT), Exhibit 2, Docket Entry No. 31-2, p. 45).

defendant.[25]  Plaintiff does not explain and the court has not been able to discern how or why the excerpts from IOGT's annual reports cited by plaintiff show that IOGT exerted an unusually high degree of control over SR2020's internal affairs.

Plaintiff has also failed to allege or argue facts capable of showing what, if any, control IOGT exerted over SR2020's operations in Texas or in Houston.  Instead, plaintiff merely cites an excerpt from IOGT's annual report for the year ending December 31, 2012, stating that "[o]n the operations side, SR2020 continued to grow and opened a new Houston-based operations and sales facility."[26] Missing from plaintiff's allegations or response to IOGT's motion to dismiss are any facts capable of showing the extent to which IOGT controlled the opening, operating, or closing of SR2020's Houston office.

Neither the allegations in plaintiff's Complaint nor the excerpts from IOGT's annual reports cited in Plaintiff's Response to IOGT's motion to dismiss show that IOGT controlled SR2020 to the extent required to fuse the two entities for jurisdictional

---

[25]2009 Annual Report for Quorum Oil and Gas Technology Fund Limited (QOGT), Exhibit 2 to Plaintiff's Response, Docket Entry No. 31-2, p. 45 ("On 16 March 2009 a claim was filed against Seismic Reservoir 2020, Inc., SR2020 Inc. (the successor company to Seismic Reservoir 2020, Inc.), a director of the Quorum Oil and Gas Technology Fund Limited, and against two other individuals employed by SQFive and SR2020 Inc.  The claim was filed by a former employee and shareholder of Seismic Reservoir Inc. in the amount of $2.2 million seeking relief for wrongful dismissal and deprivation of shareholders' rights.").

[26]Id. (quoting IOGT Annual Report and Accounts for the year ended 31 December 2012, Exhibit 5, Docket Entry No. 31-5, p. 15).

purposes.  BMC Software, 83 S.W.3d at 799.  The statements in IOGT's annual reports to which plaintiff points in support of its contention that the court should pierce the jurisdictional veil evidence no more than appropriate parental involvement, i.e., that IOGT monitored SR2020's performance, supervised SR2020's finance and capital budget decisions, and articulated general policies. See PHC-Minden, 235 S.W.3d at 176 ("Appropriate parental involve- ment includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies.")).   "[L]acking here is the 'plus' factor, 'something beyond the subsidiary's mere presence within the bosom of the corporate family.'"   Id.   The court concludes that plaintiff has failed to make a prima facie showing sufficient to pierce the jurisdictional veil and have SR2020's Texas contacts imputed to IOGT.

Even if the court did find a basis on which to pierce the jurisdictional veil and have SR2020's Texas contacts imputed to IOGT, the court would still find no basis on which to assert general jurisdiction over IOGT because plaintiff has failed either to allege or to argue that SR2020 is subject to general jurisdiction in Texas.  Plaintiff alleges that SR2020 is a Delaware corporation with a principal place of business in California.[27] Plaintiff cites excerpts from IOGT's 2012 and 2013 annual reports showing that SR2020 opened a Houston-based operations and sales

---

[27]Complaint, Docket Entry No. 1, p. 2 ¶ 5.

facility in 2012 and closed that facility in 2013; that in 2014 —
after the Houston facility was closed — SR2020 engaged PanAmerican
— a Colorado company — to perform services for it in Reeves County,
Texas; and that SR2020 has been sued in Texas for failure to pay
for those services acquired in Texas.

These allegations are not sufficient to make a prima facie
showing that SR2020 had a general business presence in Texas or
contacts with Texas that were substantial, continuous, and
systematic enough to support this court's exercise of general
jurisdiction over SR2020.  Plaintiff neither alleges nor presents
any facts showing the extent, duration, or frequency of SR2020's
business operations in Texas.  "[V]ague and overgeneralized asser-
tions that give no indication as to the extent, duration, or
frequency of contacts are insufficient to support general
jurisdiction."  Johnston, 523 F.3d at 610.  See also id. at 613
(citing with approval Ratliff v. Cooper Laboratories, Inc., 444
F.2d 745, 746-48 (4th Cir. 1971) ("finding no general jurisdiction
despite the fact that the defendant had five employees located in
the forum state").

(b)  Specific Jurisdiction

Specific jurisdiction exists when the defendant lacks
substantial, continuous, and systematic contacts but has instead
some minimum contacts that establish (1) the defendant has
"purposefully directed his activities at residents of the forum,"
and (2) the plaintiff's alleged injury "arise[s] out of or

-22-

relate[s]" to those activities." Clemens v. McNamee, 615 F.3d 374,
378 (5th Cir. 2010) (quoting Burger King, 105 S. Ct. at 2182).
Specific jurisdiction exists where a "defendant purposefully avails
itself of the privilege of conducting activities within the forum
State, thus invoking the benefits and protections of its laws."
Burger King, 105 S. Ct. at 2183 (quoting Hanson v. Denckla, 78
S. Ct. 1228, 1239-40 (1958). See also Michiana Easy Livin' Country,
Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005) (recognizing
"purposeful availment" as the "touchstone of jurisdictional due
process"); Rushmore Investment Advisors, Inc. v. Frey, 231 S.W.3d
524, 527 (5th Cir. 2007) ("To establish minimum contacts, the
defendant must have purposefully availed itself of the privilege of
conducting activities inside Texas and enjoyed the benefits and
protections of Texas laws."). The specific jurisdiction analysis
"'focuses on the relationship among the defendant, the forum, and
the litigation.'" Waldern v. Fiore, 134 S. Ct. 1115, 1124 (2014)
(quoting Keeton v. Hustler Magazine, Inc., 104 S. Ct. 1473 (1984)).
The Fifth Circuit has stated that

> [f]or specific jurisdiction to be proper, Due Process
> requires (1) minimum contacts by the defendant
> purposefully directed at the forum state, (2) a nexus
> between the defendant's contacts and the plaintiff's
> claims, and (3) that the exercise of jurisdiction over the
> defendant be fair and reasonable.

In re Chinese-Manufactured Drywall Products Liability Litigation,
753 F.3d 521, 540 (5th Cir. 2014) (citing ITL International, Inc. v.
Constenla, S.A., 669 F.3d 493, 498 (5th Cir. 2012)). "In sum, to

-23-

satisfy Due Process, the defendant's connection with the forum state must be such that it 'should reasonably anticipate being haled into court' in the forum state." Id. (quoting World-Wide Volkswagen Corp. v. Woodson, 100 S. Ct. 559, 567 (1980)). Plaintiff bears the burden of making out a prima facie case with respect to the first two prongs of the specific jurisdiction analysis. Monkton Insurance Services, Ltd. v. Ritter, 768 F.3d 429, 433 (5th Cir. 2014) (quoting Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 271 (5th Cir. 2006).

IOGT argues that its

> activities in Texas do not come close to the level of contacts of other defendants in cases where courts have found no specific jurisdiction. IOGT's only involvement was the release of certain of IOGT's Liens so that OptaSense could acquire SR2020's property, for which OptaSense provided the Earnout Note to IOGT. *Hill Declaration*, Ex. 3 at ¶ 7. IOGT's limited involvement was conducted by IOGT outside of the United States. *See Hill Declaration*, Ex. 3 at ¶ 5-6. Plaintiff does not even allege that IOGT took any actions or performed any tasks in the United States.[28]

IOGT also argues that it "engaged in all activity giving rise to the alleged causes of action outside the United States, never traveled to Texas, and never appeared in a case in Texas, and did not direct its activities at Texas residents."[29]

Plaintiff argues in response that "[e]ven if the Defendant's continuous and systematic activity were somehow insufficient for

---

[28]IOGT's Motion to Dismiss, Docket Entry No. 29, pp. 12-13 ¶ 21.

[29]Id. at 13 ¶ 22.

general personal jurisdiction, the Defendant would still be subject to specific personal jurisdiction arising from its April 2014 sale of SR2020 services in Texas."[30]   Plaintiff argues that

> [a]s a result of its "wind-down" strategy (which auditors stated was largely "dependent on the receipt of capital from exits" — *i.e.*, liquidations) [IOGT] closed its SR2020 facility in Houston and relied upon heavy equipment from third-party vendors such as the Plaintiff and PanAmerican Seismic, Inc. (whose half-million-dollar receivable underlies this action).  [IOGT], in the midst of winding down its global enterprise, had its SR2020 business: (1) liquidate Houston operations; (2) obtain trade credit so that it could still secure revenue from a Texas oilfield project; (3) not pay those trade creditors; (4) divert revenue from the Texas oilfield project; and (5) engage in a textbook fraudulent transfer upon the sale of its SR2020 assets to OptaSense, Inc. in Houston.[31]

Plaintiff argues that IOGT's "conduct was specifically directed at this forum, the Plaintiff and PanAmerican suffered injury from that conduct, and exercising personal jurisdiction would not offend traditional notions of fair play and substantial justice."[32]

There are three problems with plaintiff's argument.  First, plaintiff argues that IOGT's conduct was specifically directed at this forum, but has not alleged or argued that IOGT — as opposed to SR2020 — has had even minimum contacts with this forum.  Second, for the reasons explained in § II.A.3(a), above, the court has already concluded that plaintiff has failed to show the existence

---

[30]Plaintiff's Response, Docket Entry No. 31, p. 4.

[31]<u>Id.</u> at 4-5 (citing IOGT's Annual Report and Accounts for the year ended 31 December 2013, Exhibit 6, p. 3).

[32]<u>Id.</u> at 7.

of facts sufficient to pierce the jurisdictional veil and impute
SR2020's contacts with Texas to IOGT.  Missing from Plaintiff's
Complaint and Response in opposition to IOGT's motion to dismiss
are any facts capable of showing that IOGT and not SR2020
negotiated or executed either the sale of SR2020's services on the
Cimarex Cleveland pad in Reeves County, Texas, in April, May, or
June of 2014, or the sale of SR2020's assets to Houston company
OptaSense in November of 2014.  Finally, to the extent that
plaintiff is attempting to invoke the "effects" test for
establishing minimum contacts necessary for the exercise of
specific personal jurisdiction recognized by the Supreme Court in
Calder v. Jones, 104 S. Ct. 1482 (1984), that argument fails
because plaintiff has neither cited Calder, nor alleged that IOGT's
conduct amounts to an intentional tort intended or highly likely to
harm plaintiff's predecessor in interest, PanAmerican, in Texas.
See Mullins v. TestAmerica, Inc., 564 F.3d 386, 398-402 (5th Cir.
2009) (citing Calder, 104 S. Ct. at 1482).

     In Mullins, 564 F.3d at 386, a Texas creditor sued a debtor and
related parties who subsequently received funds alleged to have been
transferred fraudulently in violation of TUFTA.  The Fifth Circuit
upheld the district court's exercise of personal jurisdiction over
defendants who had no contacts with the forum state of Texas other
than their alleged involvement in a fraudulent transfer scheme upon
concluding that defendants had "purposefully aimed their conduct at
. . . Texas . . . with the knowledge that their conduct would . . .

-26-

impair the rights of a single, major creditor and Texas resident under agreements that center around Texas." Id. at 398.

The Fifth Circuit reached this holding by interpreting the Calder "effects" test to allow "an act done outside the state that has consequences or effects within the state [to] suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." Id. at 400 (citations omitted). Because the plaintiff was a Texas resident, because the defendant was "acutely aware" that its conduct would thwart the plaintiff's claim to a portion of the proceeds involved, and because the contracts governing the parties' business relationship were governed by Texas law, the Fifth Circuit held that the defendants "should reasonably have anticipated being haled into a Texas court for precipitating and directing an alleged[ly] fraudulent transfer at the expense of a known, major creditor in Texas whose right to payment arises out of contracts that share a strong connection with Texas." Id. at 402. The Fifth Circuit expressed skepticism at notions that the Calder effects test establishes personal jurisdiction whenever the recipient of a fraudulent transfer injures a creditor, or that "personal jurisdiction exists over the recipient of a fraudulent transfer anywhere a complaining creditor files suit simply by virtue of the creditor's residence in that forum." Id. at 401. But in Mullins the Fifth Circuit was able to overcome its skepticism based on

evidence that the plaintiff/creditor had been targeted and singled out by the defendants and that the defendants intended to block any sale that included a distribution of assets to that specific creditor.  Id. at 402.

As in Mullins, plaintiff's claims against IOGT in this action are for TUFTA violations arising from IOGT's alleged participation in a fraudulent scheme to transfer a related-party's assets to prevent satisfaction of debts owed by that related-party.  However, unlike Mullins, where the defendants targeted and singled out a specific creditor for non-payment, there are no allegations here that IOGT targeted and singled out the plaintiff or the plaintiff's predecessor in interest, PanAmerican.  Instead, plaintiff alleges that IOGT "caused SR2020 to transfer intellectual property which the buyer/transferee valued at $2.7 million, but a million dollars of that purchase price was to be paid directly to [IOGT] *instead of the transferor,* hindering, delaying, and defrauding **creditors** of the transferor."[33]  Fairly construed, plaintiff's allegations are that IOGT's actions negatively impacted all of SR2020's creditors,

---

[33]Complaint, Docket Entry No. 1, p. 7 ¶ 19 (Count I, claim for intentional fraudulent transfer (emphasis added)).  See also id. at 8 ¶ 22 (Count II, claim for constructive fraudulent transfer in violation of § 24.006, "At the time of the . . . transfer, SR2020 was insolvent.  This is evidenced by SR2020 CFO Deanna Monzon's statement to that effect on October 30, 2014 as well as by SR2020's failure to pay its vendors such as PanAmerican."); id. at 10 ¶ 22 ("At the time of the transfer, SR2020 was engaged in a business with multiple transactions for which the remaining assets of SR2020 were unreasonably small in relation to the business and transactions, which is evidenced by SR2020's failure to pay its vendors such as PanAmerican.").

not just one specific creditor in one specific forum. This construction is corroborated ·by plaintiff's allegations that PanAmerican is a Colorado corporation,[34] that plaintiff purchased PanAmerican's SR2020 account receivable on February 10, 2015, i.e.,[35] approximately three months after the allegedly fraudulent transaction occurred on November 20, 2014,[36] and that on October 31, 2014, SR2020 was sued in Harris County Civil Court at Law No. 3 (Case No. 1054789) for an account receivable not the subject of this action.[37]   These allegations do not support the court's exercise of specific personal jurisdiction in this case because they show that any scheme IOGT may have had to defraud SR2020's creditors was not purposefully aimed at any particular creditor in any particular forum but was, instead, aimed at all of SR2020's creditors wherever they were located.   Thus, the actions underlying this case differ from the purposeful, targeted actions directed at Texas on which the Fifth Circuit upheld the exercise of personal jurisdiction over the foreign defendants in Mullins.

Plaintiff has neither alleged nor shown that IOGT purposefully or expressly aimed its allegedly tortious conduct at Texas or at a single known creditor in Texas, that IOGT knew or intended that the

---

[34] Id. at 2 ¶ 5.

[35] Id. at 4 ¶ 12.

[36] Id. at 5 ¶ 16.

[37] Id. at 4 ¶ 14.

effects of its allegedly tortious conduct would be felt in Texas, that either the Earnout Note or the contract governing PanAmerican's work for SR2020 in Texas is governed by Texas law,[38] or that IOGT engaged in any activity through which it can reasonably be said to have "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King, 105 S. Ct. at 2183.   Accordingly, the court concludes that plaintiff has failed to make a prima facie showing that IOGT's minimum contacts with the forum state of Texas are sufficient for this court to exercise specific personal jurisdiction over IOGT.

**B.   Plaintiff Has Not Established _In Rem_ Jurisdiction**

Plaintiff argues that

> [e]ven if personal jurisdiction did not exist (and it
> does), this Court could still exercise _in rem_
> jurisdiction over the fraudulently transferred asset
> proceeds located in Houston.   A right to payment (the
> "Earnout Note") was transferred to the Defendant.   That
> this right is _unliquidated_ does not mean it doesn't
> exist.   If the Defendant were to settle, it could assign
> the Earnout Note just like any other right.   The
> Defendant's bewildering argument here is akin to saying,
> "The Court cannot rule upon title to an unscratched
> lottery ticket."   The Court certainly can.   The
> Defendant's subject matter arguments on ripeness and

---

[38]IOGT's declarant, Christopher Hill, states that the Earnout Note is governed by Delaware law, and plaintiff has not submitted any conflicting evidence.   See Hill Declaration, Exhibit 3 to IOGT's Motion to Dismiss, Docket Entry No. 29-2, pp. 3 ¶ 7.   See also IOGT's Motion to Dismiss, Docket Entry No. 29, p. 10 ¶ 14.

fitness for decision are spurious.  Its arguments about
Delaware are even more so (explained next).[39]

Plaintiff's argument that the requirement of subject matter
jurisdiction is satisfied by _in rem_ jurisdiction has no merit.

   "An _in rem_ action is brought against 'property alone, treated
as responsible for the claims asserted by . . . the plaintiff[].
The property itself is . . . the defendant . . . and its forfeiture
or sale is sought for the wrong.'"  _Phillips v. Charles Schreiner
Bank_, 894 F.2d 127, 132 (5th Cir. 1990) (citing _Freeman v.
Alderson_, 7 S. Ct. 165, 166 (1886)).  "An _In personam_ action, by
contrast, determines a defendant's personal rights and
liabilities."  _Id._  Plaintiff's Complaint seeks monetary damages
for wrongs allegedly committed by IOGT.  This lawsuit is thus an
ordinary _in personam_ action.  _Id._ (citing _Universal Business
Computing Co. v. Comprehensive Accounting Corp.,_ 539 F. Supp. 1142,
1144 (N.D. Ill. 1982) (lawsuit not an _in rem_ proceeding merely
because both parties claim a proprietary interest in a computer
software design).

## III.  Conclusions and Order

   For the reasons stated in § II.A, above, the court concludes
that plaintiff has failed to make a prima facie showing of minimum
contacts necessary to support the exercise of general or specific

---

[39]Plaintiff's Response, Docket Entry No. 31, pp. 7-8.

personal jurisdiction over the defendant, and for the reasons stated in § II.B, above, the court concludes that the plaintiff has failed to establish <u>in rem</u> jurisdiction over the property at issue, i.e., the Earnout Note. The court concludes, therefore, that this action should be dismissed without prejudice for lack of jurisdiction and that defendant's remaining grounds for dismissal are moot. Accordingly, International Oil and Gas Technology Limited's Motion to Dismiss (Docket Entry No. 29) is **GRANTED in PART and MOOT in PART.**

SIGNED at Houston, Texas, on this 19th day of August, 2015.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE

-32-